Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> CAPITAL READY MIX, INC., a California corporation; and DOES 1-10, inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## I.  INTRODUCTION

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendant CAPITAL READY MIX, INC. ("Defendant") for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

COMPLAINT – Page 1

**Notice Letter**

2.      On or about December 30, 2023, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendant, including a copy delivered to Defendant by certified mail, to Facility Manager, Capital Ready Mix, 5225 84th Street, Sacramento, California ("the facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of Plaintiff's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      More than sixty days have passed since Plaintiff's Notice was properly and lawfully served on Defendant, the State Board, and the Regional and National EPA Administrators.

5.      Plaintiff is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

6.      This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II.  PARTIES

**Plaintiff**

7.      Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS is an environmental membership group organized under the laws of the State of California.

**Defendant**

8.      Plaintiff is informed and believes, and on such information and belief alleges, that Defendant CAPITAL READY MIX, INC., located at 5225 84th Street, in Sacramento, California, is a California corporation in good standing with the California Secretary of State.

9.      Plaintiff is informed and believes, and on such information and belief alleges, that Defendant Capital Ready Mix, Inc. is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the facility.

### III.  JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

11.      Venue is proper because Defendant resides in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

### IV.  ARTICLE III STANDING

12.      Plaintiff's organizational purpose is the protection, preservation and enhancement of the rivers, creeks, streams, lakes and oceans (and their tributaries) in California.

13.      Plaintiff's organizational purpose and mission is accomplished through enforcement of the provisions of the Federal Clean Water Act and California's Industrial General Permit, in seeking redress against Industrial Dischargers who violate the CWA by failing to comply with all standard conditions of the Industrial General Permit.

14.      Plaintiff's associational members volunteer their resources to join EDEN's organizational purpose and mission.

15.      Plaintiff's associational members reside throughout Northern California.  Some of EDEN's members reside, work and/or recreate near the Sacramento River, a tributary of the Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for Defendant's storm water run-off), and use those waters and their watersheds for kayaking, canoeing, cycling, recreation, sportfishing, swimming, hiking, bird watching, photography and nature walks.  Their

use and enjoyment of these natural resources has been and continues to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA.

16.    Plaintiff has Article III standing as an association to bring this suit against Defendant, as at least one of EDEN's current members is experiencing an ongoing, concrete, and particularized injury fairly traceable to Defendant's violations of the CWA and Industrial General Permit, which likely can be redressed by a judicial decision granting Plaintiff the injunctive relief requested herein.

17.    The aesthetic and recreational interests of the individual associational members of Plaintiff with Article III standing have been adversely impacted by Defendant's failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA, as delineated herein.

18.    Plaintiff's associational members who qualify for standing in this matter are all current members who have been members of EDEN since at least December 30, 2023, the date that Plaintiff provided to Defendant the Notice Letter attached hereto as **Exhibit A.**

19.    Defendant's ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to Plaintiff and its current standing members.

20.    The relief requested herein will redress the ongoing injury in fact to Plaintiff and its members.

21.    Neither litigation of the claims asserted, nor the relief requested in this Complaint, will require the participation in this lawsuit of any individual members of EDEN.

## V. <u>STATUTORY BACKGROUND</u>

22.    Congress declared that the Federal Clean Water Act was designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters through federal and state cooperation to develop and implement programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters. 33 U.S.C. §§ 1251(a), 1252(a)

23.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into Waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act.  33 U.S.C. § 1342

24.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to Dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water Dischargers. 33 U.S.C. § 1342(p)

25.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits in California.

Citizen Suit Provision of the CWA

26.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1)

27.     No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation to: (i) the Administrator of the EPA; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A)

28.     By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

29.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties

under section 1319(d).  33 U.S.C. § 1365(a).   Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, $56,460.00 per day per violation for violations occurring after November 2, 2015; and $57,617.00 per day per violation, for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI(Q(1)

30.    Violations of the provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

A.  **General Permit**

31.    The Water Board elected to issue a statewide General Permit for industrial storm water discharges.   Thus, the Permit under which this case arises is a federally required permit based upon California state substantive law.  *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016)

32.    The Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The Permit was reissued on April 17, 1997, and again on April 1, 2014 ("General Permit"), pursuant to Section 402(p) of the Clean Water Act. 33 U.S.C. § 1342(p)

33.    The current General Permit went into effect on July 1, 2015, after which it was amended again on November 6, 2018, with the revisions becoming effective on July 1, 2020. [See California's Industrial General Permit, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ, which is fully incorporated herein by reference.]

34.    A complete copy of the current General Permit Order is accessible at https://www.waterboards.ca.gov/water_issues/programs/storm_water/igp_20140057dwq.html

35.     The General Permit includes both absolute *discharge prohibitions* and substantive and procedural *standard condition* provisions.

36.     To discharge storm water lawfully in California, all industrial facilities discharging, or having the potential to discharge, storm water associated with industrial activity ("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing Permit Registration Documents, including a Notice of Intent to Discharge Storm water ("NOI") and an initial Storm Water Pollution Prevention Plan ("SWPPP") and Site Map.

37.     The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

### 1. **SMARTS Compliance Database**

38.     The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where Dischargers enter and manage storm water data associated with General Permit compliance.

39.     SMARTS is readily accessible by the general public on the web; and the system is maintained primarily for the purpose of providing public access to allow citizens to monitor Dischargers' compliance with the General Permit and to pursue Dischargers who fail to comply, utilizing the citizen's suit provision of the CWA.

40.     SMARTS can be accessed at California Stormwater Multiple Applications and Report Tracking System.

41.     The General Permit requires Dischargers to certify (under penalty of law) and submit to SMARTS all Permit Registration Documents, including Notices of Intent to Discharge Storm Water, Storm Water Pollution Prevention Plans and Site Maps; monitoring and sampling data, Exceedance Response Reports and Annual Reports.  General Permit §§ I(A)(17), II(A)(1), II(B)(1), II(D), XI(B)(11)(a), XXI(K), XXI(L), Attachment D.

## 2. <u>Discharge Prohibitions of the General Permit</u>

42. The discharge related prohibitions of the General Permit include Effluent Limitation V(A) of the General Permit, which requires Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

43. Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

44. Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plans or the applicable Regional Water Board's Basin Plan.

## 3. <u>Standard Conditions of the General Permit</u>

45. In addition to discharge prohibitions, the General Permit contains a variety of substantive and procedural standard conditions.

46. The General Permit requires that Dischargers comply with all standard conditions of the Permit and indicates that failure to comply with any standard condition of the General Permit constitutes an actionable, per se violation of the CWA, which comports with the provisions of 33 U.S.C. §1365(f)(7). General Permit § XXI(A)

47. The primary standard conditions of the General Permit include the following:

(a) Continuously maintaining an accurate, up-to-date and compliant *SWPPP and Site Map*; implementing all provisions of the SWPPP, and certifying and submitting the SWPPP to SMARTS;

(b) Implementing and maintaining *Best Management Practices* ("BMPs");

(c)    Conducting monthly and sampling event *visual observations*, contemporaneously completing observation reports and maintaining the reports for five years;

(d)    Collecting and analyzing *storm water runoff samples* four times per year;

(e)    Collecting the *storm water samples during qualified storm events, from all discharge locations, in all drainage areas* in places which are representative of industrial operations;

(f)    Testing the collected storm water samples for *all required parameters,* using the correct EPA test methods, and the prescribed sample holding times; and reporting the results to the Water Board within 30 days by certifying and submitting them to SMARTS;

(g)    Conducting *Annual Facility Compliance Evaluations* and contemporaneously preparing and retaining evaluation reports;

(h)    Preparing compliant *Exceedance Response Reports* in the event that storm water sampling data confirms an annual exceedance of any sampling parameter within the specified time limits, and certifying and submitting the reports to SMARTS;

(i)    Preparing complete and accurate *Annual Reports* and certifying and submitting them to SMARTS; and

(j)    Establishing a *Pollution Prevention Team* of at least two on-site employees and ensuring that the Team remains fully trained on all aspects of compliance with the General Permit.

SWPPP and Site Map Requirements

48.    All Dischargers are required to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").

49.    The main objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the Discharger's facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit § X(C).  These BMPs must achieve compliance with the General Permit's

effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

50.    To ensure compliance with the General Permit, the SWPPP must be evaluated and revised within ninety (90) days when there are routine revisions to be made; and within thirty (30) days whenever the SWPPP requires significant revisions. General Permit § X(B)

51.    Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP when necessary, is a violation of the General Permit. General Permit §§ I(J)(68), II(B)(3)(a), X(A), X(B), General Permit Fact Sheet § I(1)

52.    Among other requirements, the SWPPP must include: a detailed description of the facility's industrial processes and operations; identification of a pollution prevention team; a site map; a list of industrial materials handled and stored at the site, including the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency; a description of potential pollutant sources; an assessment of potential pollutant sources (specifically, whether the pollutants have the potential to commingle with storm water);  a monitoring implementation plan, including a discussion of facility drainage, drainage areas, and discharge points and sampling locations; all mandatory sampling parameters; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges.   General Permit §§ X(A)-X(I)

53.    The General Permit also requires that SWPPPs include detailed BMP Descriptions and a BMP Summary Table.  General Permit § X(H)(4), (5)

54.    Site Maps are required to depict the following: the facility boundary, storm water drainage areas, storm water flow direction, on-site surface water bodies and/or locations of nearby water bodies, municipal storm drain inlets that receive storm water discharges, locations of storm water collection and conveyance systems, associated discharge locations, sampling locations, locations and descriptions of structural control measures, identification of all impervious areas, locations where materials are directly exposed to precipitation, locations where

significant spills or leaks have occurred, and all areas of industrial activity, including industrial storage areas.  General Permit § X(E)

<u>Best Management Practices</u>

55.    The General Permit requires all Dischargers to implement and maintain the following minimum Best Management Practices to reduce or prevent pollutants in industrial storm water discharges at their facility: Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, and Quality Assurance and Record Keeping. General Permit § X(H)(1)

56.    The General Permit further requires Dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit § X(H)(2)

57.    Failure to implement minimum and advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. General Permit Fact Sheet §I(I)(2)(o)

<u>Monitoring and Reporting/Storm Water Sampling and Analysis</u>

58.    The General Permit requires Dischargers to develop and implement an adequate Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

59.    As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce storm water discharges, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

60.    Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

61.    A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

62.    Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload to SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §§ XI(B)(8), XI(B)(11)

63.    Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, all additional parameters indicated in the Permit by facility type (standard industrial classification code), and all parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit § XI(B)(6)(c)

64.    Facilities are also required to conduct monthly and sampling event visual observations.   Monthly visual observations are conducted during dry weather and must include observing each drainage area for the presence of non-storm water discharges; as well as inspecting outdoor industrial equipment and storage areas, outdoor industrial activities areas, and all other potential sources of industrial pollutants, and monitoring BMPs for effectiveness. Sampling event visual observations are conducted at the same time as sampling occurs at a discharge location and must include observing storm water discharges for the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris and sources of any discharge pollutants.  General Permit § XI(A)

65.    The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair or contribute to impairing water quality or affect human health from ingestion of water or fish.

66.    The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks.  The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

67.    The NALs established under the General Permit for pollution parameters applicable to all Dischargers are set forth in Table 2, which is incorporated herein by reference.

<u>NAL Exceedances-Exceedance Response Actions</u>

68.    An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than the annual NALs, which are listed on Table 2. The reporting year runs from July 1 to June 30.

69.    An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A), Table 2

70.    When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status" commencing July 1 of the reporting year following the entry into Level 1 status.

71.    Once a Discharger has entered Level 1 Status, by October 1 following commencement of Level 1 status, it must conduct a thorough facility evaluation with the assistance of a Qualified Industrial Stormwater Practitioner (QISP) of all drainage areas to determine the industrial pollutant sources at the facility that are or may be related to the exceedance(s), and identify the corresponding BMPs in the SWPPP and any additional BMPs and SWPP revisions necessary to prevent future exceedances.   General Permit § XIII(C)

72.    By January 1 following commencement of Level 1 status, the Discharger must revise its SWPPP, implement any additional BMPs identified in the evaluation, and certify and submit to SMARTS a Level 1 Exceedance Response Action (ERA) Report.  General Permit § XIII(C)

73.    If a discharger exceeds an applicable NAL during Level 1 Status, it is elevated to "Level 2 Status."  General Permit §XII(D)

74.    On January 1 of the reporting year following entry into Level 2 Status, a Discharger is required to submit to SMARTS a Level 2 ERA Action Plan identifying its selection of one of three options to remediate the continuing exceedances: implementation of additional BMPs, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  The Action Plan must also include a schedule for completion of the tasks.   General Permit § XII(D)(1)

75.    On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, the Discharger is required to submit a Level 2 Technical Report demonstrating its efforts to implement the additional BMPs or confirming the non-industrial sources of the pollutants causing the exceedances.  General Permit § XII(D)(2)

76.    A Discharger is also required to submit a Level 2 Technical Report update (recertification) on January 1 of the reporting year following the submittal of the Level 2 Technical Report if the Discharger continues to experience exceedances of the same sampling parameters for which it entered Level 2.  General Permit § XII(D)(3)(c)

<u>Annual Comprehensive Facility Evaluation</u>

77.    The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit § XV

Annual Reports

78.     Section XVI(A) of the General Permit requires all Dischargers to certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year.

79.     Annual Reports are auto populated by SMARTS from Dischargers' answers to a series of twelve questions, which require mostly yes/no responses.

80.     The questions include whether the Discharger has conducted monthly visual observations, collected and analyzed the required number of storm water samples from all discharge locations at its facility; and where the facility is located within an impaired watershed, the Discharger has assessed whether any of the receiving water impairments are potential pollutants present at their facility.

81.     Any "no" responses to the above questions require a complete and accurate explanation, certified under penalty of law.

Certification of Compliance Documents

82.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Party (LRP) or Duly Authorized Representative (DAR) of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

**B. Central Valley Region Basin Plan**

83.     The Regional Water Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin

Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

84.    The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

85.    The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

86.    The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

87.    The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

88.    The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

89.    The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

90.    The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of

the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

91.     The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

92.     The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

93.     Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

## VI.    SPECIFIC FACTUAL ALLEGATIONS

### A.    The Facility

94.     Capital Ready Mix, located at 5225 84th Street in Sacramento, California, is a facility that manufactures and delivers ready mix concrete.

95.     Plaintiff is informed and believes that the facility falls under standard industrial classification ("SIC") code 3273-Concrete products, NEC, based on public records.

96.     SIC Code 3273 is included in Attachment A of the General Permit as a type of industrial operation that requires application for and receipt of General Permit coverage.

97.     Defendant stores and handles industrial chemicals and materials outdoors that are exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

98.     During rain events, storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the Facility settle onto the ground.

99.    Storm water flowing over these areas collects suspended sediment, dirt, metals, and other chemicals and toxic pollutants as it flows towards the Facility's storm water channels, and discharges from the Facility into its Receiving Waters.

100.    Based on the foregoing, Plaintiff alleges that Defendant is required to maintain standard General Permit coverage and is not eligible to apply for or receive either No Exposure Certification (NEC coverage) or Notice of Non-Applicability (NONA coverage).

**B.    The Facility's Receiving Waters**

101.    Based on Plaintiff's investigation, including but not limited to a review of the Defendant's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"); SWPPP and Site Map, aerial photography and drone footage; federal, state and local regulatory agency mapping tools; and eyewitness reports, storm water leaves the boundaries of Defendant's facility and enters Morrison Creek , via both the City of Sacramento MS4  and surface flow, before discharging to the Sacramento River and the Sacramento-San Joaquin River Delta, a navigable Water of the United States.

102.    On February 16, 2021, Defendant certified under penalty of law to the Water Board and the general public via SMARTS that storm water discharges from the facility enter Morrison Creek.  (See **Exhibit B**, attached hereto and incorporated herein by reference)

103.    Plaintiff alleges that the Best Management Practices at Defendant's facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to Waters of the United States.

**C.    Defendant's General Permit Violations**

Deficient SWPPP/Failure to Follow SWPPP

104.    Plaintiff alleges that since at least February 18, 2021, Defendant has failed to implement an adequate SWPPP for the facility and has failed to comply with the terms of its deficient SWPPP, in violation of the standard conditions of the General Permit.   General Permit §§ I(J), II(A)(1), II(B)(1)(b), II(B)(3), X, XXI(A), XXI(K)(1), XXI(L); General Permit Fact Sheet § II(I)(1); 33 U.S.C. § 1365(f)(7)

105.    Defendant's continuing failure to implement and follow an adequate SWPPP is evidenced by documents uploaded and certified to SMARTS under penalty of law by Capital Ready Mix, as well as by required documents which have not been uploaded to SMARTS.

106.    Defendant's continuing failure to implement an adequate SWPPP is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies.

107.    Defendant's current SWPPP and Site Map remain deficient for failure to include the following:  (a) complete and accurate Pollutant Source Assessment and Industrial Material Inventory List [violation of General Permit §§ X(F), X(G) and XI(B)(6)]; (b) all mandatory sampling parameters [violation of General Permit § XI(B)(6)]; (c) sufficient detail regarding Facility operations and industrial processes [violation of General Permit § X(G)(1)]; and (d) accurate discussion and depiction of Facility drainage, discharge locations and sampling points [violation of General Permit §§  X(I) and X(G)(1)(e)].

108.    Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP and Site Map do not include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

109.    According to information available to Plaintiff, Defendant's current SWPPP has not been evaluated to ensure its effectiveness and has not been revised as required by the General Permit to reflect true conditions at the Facility and to prevent discharges of contaminated storm water.

110.    According to information available to Plaintiff, Defendant's current SWPPP and Site Map contains misleading, false or insufficient information regarding facility operations and processes; drainage, drainage areas and storm water flow; discharge locations and mandatory sampling points; the type, amount and location of industrial materials and chemicals handled at

the facility; and all mandatory required sampling parameters associated with the facility's industrial materials and chemicals.

111.    Plaintiff alleges that Defendant's current SWPPP and Site Map do not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT.

112.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continue to fail to alter the Facility's SWPPP/Site Map and site-specific BMPs to comply with the requirements of the General Permit.

113.    In addition, Plaintiff alleges that Defendant has failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting.

114.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the Sacramento River and the Sacramento-San Joaquin River Delta.

115.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendant's deficient SWPPP/Site Map are ongoing and continuous.

Monitoring and Reporting/ Storm Water Sampling

116.    Plaintiff alleges that Defendant's monitoring and reporting program at Capital Ready Mix in Sacramento is deficient and in violation of the mandatory standard conditions of the General Permit.  General Permit §§ X, X(I), XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii); 33 U.S.C. § 1365(f)(7)

117.    Defendant's deficient monitoring and reporting program is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

118.    Defendant's deficient monitoring and reporting program is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and

government agencies, as well as other relevant documents maintained by Defendant and governmental and regulatory agencies.

119.    Since February 18, 2021, Defendant has failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

120.    In addition, Defendant has failed to conduct monthly visual observations of storm water discharges at the facility since at least February 18, 2021.

121.    Defendant has also collected samples of storm water discharges at the facility that failed to comply with the General Permit's requirement that samples be preceded by a 48-hour period without a discharge, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

122.    Defendant has failed to collect storm water samples from each drainage area at all discharge locations at its facility, for each QSE where sampling is performed, pursuant to General Permit § XI(B), as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

123.    Defendant has failed to analyze the facility's storm water samples for all required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

124.    Defendant has failed to upload facility storm water sample analyses within 30 days of obtaining the results of the sampling event, in violation of Section XI(B)(11) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

<u>Falsification of Annual Reports</u>

125.    Since February 18, 2021, Defendant has submitted inaccurate and/or falsified Annual Reports to the Regional Water Quality Control Board in violation of the standard conditions of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ II(A)(1),

XI(A)(C), XVI, XXI(K), XXI(L), XXI(N); General Permit Fact Sheet § II(O); 33 U.S.C. § 1365(f)(7)

126.    Defendant's submission of false Annual Reports and continuing failure to retract its false statements to the Water Board and the general public is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant.

127.    Defendant's submission of false Annual Reports is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

128.    Defendant's submission of false statements to the Water Board and the general public is ongoing and continuous.

Failure to Implement BAT/BCT; BMP Deficiencies

129.    Since at least February 18, 2021, Defendant has failed to identify and implement Best Management Practices ("BMPs") at the Facility which comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants.

130.    These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

131.    Defendant's failure to implement proper minimum BMPs is in violation of the standard conditions of the General Permit.   General Permit §§ I(C), V(A), X, XXI(A); General Permit Fact Sheet §§ II(I)(2)(o); 33 U.S.C. § 1365(f)(7)

132.    Defendant's BMP deficiencies are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

133.    Defendant's BMP deficiencies are also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

134.    Defendant's BMP deficiencies are more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

135.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the facility to the Sacramento River.

Discharges of Contaminated Storm Water

136.    Since at least February 18, 2021, Defendant has discharged contaminated storm water from its facility in violation of the absolute discharge provisions and the standard conditions of the General Permit, as is more particularly described herein, as well as in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ I(D), I(C), I(K)(77), III, V(A), VI, X, X.I, XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii), II(I)(2)(o), II(K)(2)(b); 33 U.S.C. § 1365(f)(7)

137.    Defendant's discharges of contaminated storm water in violation of the General Permit are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

138.    Defendant's discharges of contaminated storm water in violation of the General Permit are also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

139.    Information available to Plaintiff indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation

necessary to prevent these discharges, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

140.    Due to the nature of the operations at Defendant's facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendant is discharging storm water containing excessive levels of pollutants specific to its operation during at least every significant local rain event.

141.    Defendant has repeatedly failed and refused to include accurate information in the Facility's SWPPP regarding industrial operations, processes and materials, as well as locations where sampling and monitoring are required; and Defendant has failed to test Facility storm water runoff samples for all required parameters, resulting in unmonitored pollutants freely flowing from the Facility into the Sacramento River and its tributaries.

142.    Specifically, Plaintiff is informed and believes, and on that basis alleges, that the unmonitored pollutants being discharged by the Facility include Iron, Zinc, Aluminum, Chemical Oxygen Demand (COD) and Biochemical Oxygen Demand (BOD).

143.    In addition, Defendant's self-monitoring Ad Hoc Reports evidence certified and submitted to SMARTS evidence exceedances of monitored parameters, including Iron, Total Suspended Solids and pH, as is more particularly described in Plaintiff's Notice Letter attached hereto as **Exhibit A**.

144.    While exceedances of the Numeric Action Limits set forth in Table 2 of the General Permit are not in and of themselves violations of the General Permit, when coupled with BMP deficiencies and/or violations of the required Exceedance Response Actions, the exceedances are transformed into per se violations of the General Permit.    (See Compliance Flowchart; General Permit §§ I(K)(70), I(K)(77), V(A), XII; General Permit Fact Sheet §§ II(I)(3)(a)(iii), II(I)(2)(o), II(K)(2)(b)

145.    As set forth above, Defendant has failed to implement and maintain required Best Management Practices.

146.    Defendant's discharges of contaminated storm water in violation of the General Permit is ongoing and continuous.

<u>Failure to Train Employees</u>

147.    Since at least February 18, 2021, Defendant has failed to implement and train a Pollution Prevention Team at the facility, in violation of the standard conditions of the General Permit.   General Permit §§, I(K)(70), I(K)(77), I(I)(63), IX(A)(3), X(D), XXI(A), 33 U.S.C. 1365(f)(7)

148.    The General Permit requires all Dischargers to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

149.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

150.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies.

151.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is also evidenced by Defendant's ongoing and continuing General Permit violations.

152.    Other evidence of Defendant's failure to implement and train a Pollution Prevention Team includes the fact that previously designated Team Members have left the Facility and have been replaced without being trained, as well as that some of the designated

Pollution Prevention Team Members are regional employees not assigned to work at the Sacramento Capital Ready Mix Facility.

153.    In addition, Defendant was required to have a Qualified Industrial Stormwater Practitioner (QISP) conduct training of the Facility's Pollution Prevention Team after it entered Level 1 Status on July 1, 2023, and to date has failed to do so.

154.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is ongoing and continuous.

### D. **Information Injuries Caused by Defendant's General Permit Violations**

155.    In addition to harming the aesthetic and recreational interests of Plaintiff's members with standing in this matter, Defendant's violations of the standard conditions of California's Industrial General Permit have caused informational injuries to EDEN's standing members by depriving these members of their substantive constitutional and statutory rights to obtain information regarding Defendant's compliance with standard conditions of California's Industrial General Permit, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

156.    As set forth in more detail herein, Defendant has failed and refused to comply with all mandatory standard conditions of the General Permit, including maintaining a deficient SWPPP which includes objectively false information related to drainage, outdoor handling of industrial materials and storm water flow/sampling locations; failing to collect and analyze the required number of storm water samples; failing to test storm water samples for the proper parameters; and providing incomplete and false information in Annual Reports.

157.    Defendant's failure to comply with the standard conditions of the General Permit as set forth above have prevented Plaintiff's members with Article III standing from: (a) accessing on SMARTS the true operational facts relevant to Defendant's facility; and (b) acquiring accurate and complete data related to the unmonitored pollutants emanating from Defendant's facility during rain events and discharging into the facility's Receiving Waters.

158.     As such, Plaintiff's members with Article III standing are unable to fully assess the extent of Defendant's General Permit violations, as well as the types and levels of pollutants entering the affected waterways due to Defendant's willful violations of the standard conditions of the General Permit; or to even gauge the potential health ramifications to themselves should they continue to recreate in the affected waterways.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

159.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

160.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP, including a Site Map.

161.     As outlined herein, Defendant has failed to develop and implement an adequate SWPPP for its facility.

162.     Each day since February 18, 2021, that Defendant has failed to develop, implement and update an adequate SWPPP for the facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

163.      These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and upload to SMARTS a compliant SWPPP and Site Map.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

164.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

165.    The General Permit requires Dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

166.    As outlined herein, Defendant has failed to develop and implement an adequate monitoring and reporting program for the Capital Ready Mix facility.

167.    Each day since at least February 18, 2021, that Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

168.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop and implement a compliant monitoring and reporting program.

**THIRD CAUSE OF ACTION**
**Submission of False Annual Reports to the Regional Water Board**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

169.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

170.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information. As delineated herein, Defendant made false representations in the Facility's Annual Reports and has failed to correct or retract the false statements.

171.    Each time since February 18, 2021, that Defendant submitted false or misleading statements to the Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act. 33 U.S.C. § 1311(a)

172.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's failure to withdraw any of the false and/or incomplete Reports submitted to the Water Board.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

173.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.  The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of Best Management Practices (BMPs), including Best Available Treatment (BAT) for toxic and nonconventional pollutants and Best Conventional Treatment (BCT) technologies for conventional pollutants.

174.    As alleged herein, Defendant has failed to implement BAT and BCT at the facility for its discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

175.    As alleged herein, Defendant has failed to implement the required minimum Best Management Practices at the Facility.

176.    Each day since at least February 18, 2021, that Defendant failed to implement the required minimum BMPs and to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

177.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and maintain adequate BMPs at its Facility.

**FIFTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

178.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

179.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

180.    Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

181.    Plaintiff is informed and believes, and thereupon alleges, that since at least February 18, 2021, Defendant has been discharging polluted storm water from its facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

182.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants, becoming contaminated with pollutants associated with the industrial activity occurring at Defendant's facility.   The polluted storm water then flows untreated into the Sacramento River.

183.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

184.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit. Furthermore, discharges of pollutants in excess of EPA benchmark values set forth in Table 2 of the General Permit are in violation of the General Permit when either (a) the Discharger has failed to comply with required Exceedance Response Actions; and/or (b) the Discharger has failed to implement and maintain required Best Management Practices.  Compliance Flowchart; General Permit §I(K)77)

185.    As alleged herein, Defendant has failed to implement and maintain required Best Management Practices.

186.    Every day since at least February 18, 2021, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act.  33 U.S.C. § 1311(a)

187.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and maintain adequate minimum BMPs at its Facility and its failure to comply with required monitoring and reporting provisions of the General Permit.

**SIXTH CAUSE OF ACTION**
**Failure to Properly Train Facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

188.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

189.    Section X(D)(1) of the General Permit requires each facility to establish a Pollution Prevention Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

190.    Section X(H)(f) of the General Permit also requires that Dischargers ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained.

191.    Since at least February 18, 2021, Defendant has failed to properly implement and train a Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendant to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendant to immediately operate the Capital Ready MixCapital Ready Mix facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.    Enjoin Defendant from discharging pollutants to the surface waters surrounding its facility until such time as Capital Ready Mix has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.    Order Defendant to pay civil penalties of $57,617.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.    Order Defendant to take appropriate actions to restore the quality of United States waters impaired by activities at its facility;

6.    Order Defendant to pay Plaintiff's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

7.      Award such other and further relief as may be just and proper.

Dated:  June 25, 2025                          Respectfully,


                                               By:  ___/S/  Adam D. Brumm_____
                                                     Adam D. Brumm
                                                     Attorney for Plaintiff

# EXHIBIT A



*Central Valley* Eden Environmental Defenders

December 29, 2023

<u>Via US Mail, Certified and Email</u>

Dan Reiff          Email: dreiff2018@gmail.com
Facility Manager
Capital Ready Mix
5225 84th Street
Sacramento, CA 95826

<u>Via US Mail</u>

Tigran Aneian
Agent for Capital Ready Mix
22222 Sherman Way, Unit 206
Canoga Park, CA 91303

**Re:    Amended/Supplemental 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Capital Ready Mix:

This letter is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC ("EDEN") to give legal notice that EDEN intends to file a civil action against Capital Ready Mix ("Discharger" or "Capital Ready Mix") and the respective corporate officers and other legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the Capital Ready Mix facility located at 5225 84th Street in Sacramento, California ("the Facility" or "the site").

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below. EDEN has members throughout California. Some of

1520 E. Covell Blvd #B5                    Telephone: (800) 545-7215
Davis, CA 95616                            Email: admin@edendefenders.org

EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, duck hunting, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Capital Ready Mix, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous. As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Capital Ready Mix to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against Capital Ready Mix under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.    THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2020-XXXX-DWQ) (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around February 18, 2021, Capital Ready Mix submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit. Capital Ready Mix's assigned Waste Discharger Identification number ("WDID") is 5S34I029080.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Capital Ready Mix has committed ongoing violations of the substantive and procedural

requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  The Facility

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Capital Ready Mix's permanent facility address of 5225 84th Street in Sacramento, California.

Capital Ready Mix is a facility that manufactures and delivers ready mix concrete. Facility operations are covered under Standard Industrial Classification Code(s) (SIC) 3273 - Concrete products, NEC.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 3273, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids (TSS), and various types of oil and grease (O&G), as well as iron.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.  The Affected Receiving Waters

The Facility discharges into Morrison Creek, a tributary of the Sacramento-San Joaquin River Delta ("Receiving Waters"). The Facility's Receiving Waters are impaired for Group A Pesticides, Diazinon, Pentachlorophenol (PCP), Pyrethroids, Chlorpyrifos, Mercury and DDT (Dichlorodiphenyltrichloroethane).

The Sacramento-San Joaquin River Delta is a water of the United States. The CWA requires that water bodies such as the Sacramento-San Joaquin River Delta meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO),

Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

### III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

#### A.    *Deficient SWPPP and Site Map*

Capital Ready Mix's current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map for the Facility are inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

1.    The Site Map does not include all minimum required components for Site Maps as indicated in Section X.E of the General Permit as follows:

(a)    An accurate depiction of the facility boundary;

(b)    An accurate depiction of all storm water drainage areas within the facility boundary;

(c)    Accurate storm water flow direction of each drainage area;

(d)    At least one sampling location for every drainage area;

(e)    Sampling points which are representative of facility operations;

(f)    Locations of storm water collection and conveyance systems associated with discharge locations and the accurate flow direction (i.e. storm drain inlets and underground conveyances); and

(g)    Locations and descriptions of all structural control measures that affect industrial storm water discharges, authorized NSWDs and/or run-on.

2.      The SWPPP does not include all the required elements, as indicated below:

(a)   The **date of each SWPPP Amendment** (Section X.A.10);

(b)   A complete and detailed list of all **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a);

(c)   Adequate mandatory **Minimum Best Management Practices** (BMPs), including Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program and Quality Assurance and Record Keeping (Section X.H.1);

(d)   Detailed discussion of the **detention basin or stormwater containment system**, including its maximum capacity, including the date it was installed and whether it is designed to conform with the requirements of Section X.H.6 of the General Permit (Design Storm Standards for Treatment Control BMPs), or whether it is engineered and constructed to contain the maximum historic precipitation event;

(e)   An identification of all **Non-Storm Water Discharges** (**NSWD**s) sources and drainage areas, including an evaluation of all drains (inlets and outlets) that identifies connections to the storm water conveyance system, and a description of how all unauthorized NSWDs have been eliminated (Section X.G.e);

(f)   An appropriate **Monitoring Implementation Plan**, including **an identification of team members assigned to conduct monitoring requirements**, a detailed and accurate description of all discharge locations, a discussion of Visual Observation procedures, justifications for alternative discharge locations, if any, procedures for field instrument calibration instructions, and an example Chain of Custody form to be used when handling and shipping water quality samples to the lab (Section X.I);

(g)   A complete and accurate pollutant source assessment and the corresponding proper **sampling parameters** to include all potential pollutants present at the facility likely to come into contact with stormwater (Section XI.B.6).

EDEN's investigation and the facility's SWPPP confirms that **zinc** is present in industrial operations at the Facility. The SWPPP fails to include these pollutants as

**additional sampling parameters**, in violation of Section XI.B.6.c of the General Permit.

(h)  An appropriate and complete discussion of **drainage areas and Outfalls** from which samples must be taken during Qualified Storm Events (Section XI);

(i)  Adequate and detailed information about the Facility's **Pollution Prevention Team** (Section X.D);

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B.  *Failure to Update SWPPP*

As discussed in herein, the Facility was inspected on September 23, 2021, by Regional Water Board inspector Jenna Yang.  During that inspection, the inspector noted that the Facility's SWPPP was deficient and requested that an amended SWPPP be prepared and uploaded to the SMARTS database.

A Notice of Violation issued shortly thereafter as a result of the inspection indicated that the Facility SWPPP must be updated to comply with Section X of the General Permit.

As of the date of this Notice, Capital Ready Mix has failed to upload an adequate SWPPP pursuant to the mandates of the Regional Water Board and the General Permit.

### C.  *Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1.  <u>Failure to Conduct Visual Observations and Maintain Required Records/Reports</u>

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Section XI.A.3 required all Dischargers to complete contemporaneous records of all visual observations.  The records at a minimum must include the date, approximate time of the observation, the locations observed, the presence and probable source of any observed pollutants, the name of the person who conducted the observation, and any response actions and/or additional SWPPP revisions necessary to be taken in response to the visual observations.

Section XXI.H provides that Dischargers must produce copies of visual observation records to regulatory agencies upon request; and Section XXI.J.5 provides that Dischargers must retain either paper or electronic copies of visual observation records for at least five (5) years.

EDEN believes that between February 18, 2021 and the present, Capital Ready Mix has failed to conduct monthly and sampling visual observations pursuant to Section XI.A of the General Permit and to maintain contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

2.  <u>Failure to Collect and Analyze the Required Number of Storm Water Samples</u>

In addition, EDEN alleges that Capital Ready Mix has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, a proper and accurate explanation must be included in the Annual Report.

As of the date of this Notice, Capital Ready Mix has failed to upload into the SMARTS database system the required number of storm water run-off sample analyses for the reporting years 2020-2021, 2021-2022, and 2022-2023 and has not provided an adequate explanation for its failure to do so.

EDEN notes that Capital Ready Mix's SWPPP and Site Map indicate that the Facility has a stormwater containment system it utilizes as an Advanced BMP at the site.  However, the SWPPP does not address whether the Facility's storm water containment system is engineered and constructed to contain the maximum historic precipitation event, nor does the SWPPP provide specific engineering calculations with regard to the detention pond's capacity.  This omission is a violation of Section X.H.6 of the General Permit.

Furthermore, the Facility SWPPP in fact indicates that the Facility will collect storm water samples.

There is no evidence that the Facility's detention pond or structural stormwater containment system results in a lack of storm water discharge at the Facility, such that the Facility is not required to collect and analyze storm water samples.

The Facility has not applied for certification under the General Permit's "NONA" exclusion (Notice of Non-Applicability), pursuant to Section XX.C of the General Permit. Further, the Facility has not been approved by the Regional Water Board for the Off-Site Compliance Option specified in Attachment I of the General Permit and has not completed the required compliance tasks for the On-Site Compliance Option specified in Attachment I.

3.    Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location."   (Attachment C to General Permit-Glossary)

Capital Ready Mix's stormwater runoff sample(s) collected as listed below were not collected during Qualified Storm Events as defined by the General Permit:

| Sample Date | QSE Info |
|---|---|
| 12/27/2021 | Not a valid QSE – Collected after a large event |
| 11/8/2022 | Not a valid QSE – Collected after a large event |

4. <u>Failure to Utilize the Correct Parameter Test Method</u>

Table 2, Section XI.B.11 of the General Permit, specifies particular Test Methods for required sampling parameters, as listed below.

| PARAMETER | TEST METHOD |
|---|---|
| TSS | SM 2540-D |
| Oil & Grease | EPA 1664A |
| Zinc Total (H) | EPA 200.8 |
| Copper, Total (H) | EPA 200.8 |
| Lead, Total (H) | EPA 200.8 |
| COD | SM 5220C |
| Aluminum | EPA 200.8 |
| Iron | EPA 200.7 |
| Nitrate+Nitrite Nitrogen | SM 4500-NO3-E |
| Phosphorus | SM4500-P B+E |
| Ammonia (as N) | SM 4500-NH3 B+ C or E |
| Magnesium | EPA 200.7 |
| Cadmium | EPA 200.8 |
| Nickel | EPA 200.8 |
| Silver | EPA 200.8 |
| BOD | SM 5210B |

Capital Ready Mix's storm water analysis dated December 9, 2021, December 27, 2021, November 8, 2022, and December 1, 2022 for sample(s) collected on those dates failed to utilize the proper Test Method of EPA 1664A for Oil & Grease.

5. <u>Failure to Upload Storm Water Sample Analyses within 30 Days</u>

Section XI.B.11.a of the General Permit requires Dischargers to submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event.

Capital Ready Mix failed to upload into SMARTS within 30 days the following sampling and analytical results pursuant to Section XI.B.11.a of the General Permit:

| Sample Date | Lab Report Receipt Date | Date Uploaded into SMARTS |
|---|---|---|
| 12/9/2021 | 12/16/2021 | 10/10/2022 |
| 12/27/2021 | 1/6/2022 | 10/10/2022 |
| 11/8/2022 | 11/16/2022 | 12/19/2022 |

6. <u>Failure to Collect Samples From Each Drainage Area at all Discharge Locations</u>

Section XI.B.4 of the General Permit requires Dischargers to collect samples from all discharge locations, regardless of whether the discharges are substantially similar.  Dischargers may analyze a combined sample consisting of equal volumes, collected from as many as four substantially similar discharge locations, provided that the Discharger submits a Representative Sampling Reduction Justification form with its sample analysis, and the samples are combined in the lab in accordance with Section XI.C.5 of the General Permit.  Furthermore, Representative sampling is only allowed for sheet flow discharges or discharges from drainage areas with multiple discharge locations.

According to Capital Ready Mix's current SWPPP, the Facility has 2 discharge locations, specified as SW-1 and SW-2.  The storm water runoff sample analyses Capital Ready Mix uploaded for samples collected on the dates listed below failed to include samples from SW-1 and SW-2.

| |
|---|
| 11/8/2022 |
| 12/1/2022 |

Furthermore, the Facility did not submit a Representative Sampling Reduction Justification form with any of its sample analyses.

7. <u>Failure to Analyze Storm Water Samples for the Correct Parameters</u>

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type:  pH, Total Suspended Solids (TSS) and Oil & Grease (O&G).

Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP.

EDEN's investigation and this facility's SWPPP confirms that the following additional parameters must be included in the Facility's sampling process, as they are associated with Capital Ready Mix's industrial operations: **Zinc**.

### *False/ Deficient Annual Reports Submitted to the Water Board*

Section XXI.L of the General Permit provides as follows:

**L. Certification**

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

*"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Capital Ready Mix has failed to comply with Sections XVI.A, XXI.L and XXI.N of the General Permit by failing to submit complete and accurate Annual Report(s) to the Regional Water Board for the reporting year(s) 2020-21, 2021-22 and 2022-23.

The Annual Reports included Attachment 1 as an explanation for why Capital Ready Mix failed to collect and analyze stormwater run-off during the required number of Qualifying Storm Events during the reporting year 2020-2021 for all discharge locations, in accordance with Section XI.B.

Tigran Aneian certified in the Reports, under penalty of perjury, that the required number of stormwater samples were not collected by the Facility during the 2020-2021 reporting year because [allegedly] there were insufficient qualifying storm water discharges during the reporting years and scheduled facility operating hours.

However, EDEN's investigation confirms that this claim is objectively false. Furthermore, records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years in question there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Capital Ready Mix to have collected the requisite number of samples.

Furthermore, Tigran Aneian certified in the 2021-2022 Report, that the required number of stormwater samples were collected by the Facility during the reporting year 2021-2022 when

in fact only two storm water samples were collected and analyzed during the reporting year and not the required four.

Additionally, Capital Ready Mix's was required to submit an Annual Report for the 2022-2023 reporting year by July 15, 2023 and has failed to do so. As of the date of this notice, a 2022-2023 Annual Report has not been submitted to the SMARTS database.

### D. *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Capital Ready Mix has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges. Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Capital Ready Mix's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

### *Specific BMP Deficiencies*

On September 23, 2021, the Facility was inspected by Jenna Yang of the Regional Water Quality Control Board. During that inspection, Jenna Yang noted the following BMP deficiencies:

1. Capital Ready Mix was not effectively implementing minimum best management practices (BMPs) that minimize and prevent sediment tracking. The Industrial General Permit, section X.H.1.a.ii, states that the Discharger shall:

*"Minimize or prevent material tracking."*

Additionally, the Industrial General Permit, section X.H.1.e.iii, states that the Discharger shall:

*"Maintain effective perimeter control and stabilize all site entrances and exits to sufficiently control discharges of erodible materials from discharging or being tracked off the site."*

2. During the inspection, a water truck was observed applying water at the Facility's 25th Avenue entrance; and a storm drain inlet was observed nearby. This activity caused a turbid discharge from the Facility which had the potential to discharge to a storm drain inlet on 25th Avenue. The Industrial General Permit, section III.B, states:

*"Except for non-stormwater discharge (NSWDs) authorized by Section IV, discharges of liquids or material other than storm water, directly or indirectly to waters of the United States, are prohibited unless authorized by another NPDES permit. Unauthorized NSWDs must be either eliminated or authorized by a separate NPDES permit."*

EDEN's investigation confirms that some or all of the aforementioned BMP deficiencies are continuing to occur at the Facility.

On July 1, 2023, the Facility entered Level 1 status for annual average exceedances of iron, pH, and total suspended solids (TSS).

The facility is required to submit a Level ERA report for annual average exceedances of iron, pH and total suspended solids (TSS) by January 1, 2024. As of the date of this notice, a Level 1 ERA report has not been submitted to the SMARTS database.

### E.  *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States.  Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a

separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

Specifically, the Regional Water Board conducted a storm water compliance inspection of the Facility on September 23, 2021 ("Inspection"), which resulted in a Notice of Violation ("NOV") being issued to Capital Ready Mix on September 30, 2021.

1. <u>Discharges in Excess of Technology-Based Effluent Limitations</u>

The Industrial General Permit includes technology-based effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. (General Permit, Section X.H.)

The EPA has published Benchmark values set at the maximum pollutant concentration levels present if an industrial facility is employing BAT and BCT, as listed in Table 2 of the General Permit. The General Permit includes "Numeric Action Levels" ("NALs") derived from these Benchmark values; however, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT. (General Permit, Section I.M. (Finding 62)).

Capital Ready Mix's exceedances of Benchmark values identified in the table listed below, indicate that it has failed and is failing to employ measures that constitute BAT and BCT, in violation of the requirements of the Industrial General Permit. EDEN alleges and notifies Capital Ready Mix that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values as listed below.

These allegations are based on the Facility's self-reported data submitted to the Regional Water Board. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

Capital Ready Mix's ongoing discharges of storm water containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that it has not developed and implemented sufficient BMPs at the Facility. EPA Benchmarks are relevant to the inquiry as to whether a facility has implemented BMPs. [*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC* (E.D.Cal. 2016) 205 F.Supp.3d 1128; *Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 925; *Waterkeepers Northern California v. AG Industrial Mfg. Inc.* (9th Cir. 2004) 375 F.3d 913, 919 (concentration levels in

excess of EPA benchmarks are evidence supporting the citizen plaintiff's contention that defendant did not have appropriate BMPs to achieve BAT/BCT).]

Capital Ready Mix's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

**2.**  Discharges in Excess of Receiving Water Limitations

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations.  Receiving Water Limitations found in Section VI of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan.  Exceedances of WQS are violations of the Industrial General Permit, the CTR, the Basin Plan, any parameter included as an impairment for the Facility's Receiving Waters on the 303(d) listing, and any parameters identified by the Regional Water Board as parameters assigned a total maximum daily load (TMDL).

Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan.  (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the Sacramento-San Joaquin River Delta and its tributaries, including but not limited to the following:

• Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

• Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

• Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

•    All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

• Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below.   These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters.  Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health.  These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions of the General Permit and are evidence of ongoing violations of Effluent Limitations:

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| **Reporting Year 2020-21** | | | |
| NO SAMPLES COLLECTED | | | |
| **Reporting Year 2021-22** | | | |
| 12/9/2021 | SW-1 | Iron | 0.91 |
| | SW-2 | Iron | 0.65 |
| **Reporting Year 2022-23** | | | |
| 11/8/2022 | SW-2 | Iron | 3.2 |
| | | TSS | 480 |
| 12/1/2022 | SW-2 | Iron | 4.1 |
| | | pH | 9.31 |

*All units are listed in milligrams per liter (mg/L), except pH, which is listed in pH units (SU)

Listed below are the EPA Benchmark numeric action levels associated with the parameters, as identified on *Table 2 of the General Permit,* as well as the Maximum Contaminant Levels (MCLs) listed in the *California Code of Regulations, Title 22, Section 64431* (Table 64431-A) and the Water Quality Control Plan (*Basin Plan*) for the *California Regional Water Quality Control Board, Central*

*Valley Regional, Fifth Edition* (Revised May 2018), Basin Plan Table 3-1, Trace Element Water Quality Objectives.

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| pH | N/A | >6 or <9 SU | >6.5 or >8.5 | N/A |
| Total Suspended Solids (TSS) | 100 mg/L | 400 mg/L | N/A | N/A |
| Oil & Grease | 15 mg/L | 25 mg/L | N/A | N/A |
| Zinc | .26 mg/L | N/A | .10 mg/L | N/A |
| Copper | .0332 mg/L | N/A | .0056 mg/L | N/A |
| Lead | .262 mg/L | N/A | N/A | .05 mg/L |
| Chemical Oxygen Demand (COD) | 120 mg/L | N/A | N/A | N/A |
| Biochemical Oxygen Demand (BOD) | 30 mg/L | N/A | N/A | N/A |
| Aluminum | .75 mg/L | N/A | N/A | 1.0 mg/L |
| Iron | 1.0 mg/L | N/A | .30 mg/L | N/A |
| Nitrate + Nitrate Nitrogen | .68 mg/L | N/A | N/A | 45 mg/L |
| Phosphorus | 2.0 mg/L | N/A | N/A | N/A |
| Ammonia | 2.14 mg/L | N/A | N/A | N/A |
| Magnesium | .064 mg/L | N/A | N/A | N/A |
| Arsenic | .064 mg/L | N/A | N/A | N/A |
| Cadmium | .0053 mg/L | N/A | .00022 mg/L | .01 mg/L9i |
| Nickel | 1.02 mg/L | N/A | N/A | N/A |
| Mercury | .0014 mg/L | N/A | N/A | N/A |
| Selenium | .005 mg/L | N/A | N/A | N/A |
| Silver | .0183 mg/L | N/A | .01 mg/L | .05 mg/L |

### F.  *Failure to Comply with the Mandates of the Regional Water Board*

Pursuant to Section XIX.B of the General Permit, Regional Water Boards have general authority to enforce the provisions and requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation Plans, ERA Reports, and Annual Reports and requiring

Dischargers to revise and re-submit PRDs, conducting compliance inspections, and taking enforcement actions.

As fully discussed above, the Regional Water Quality Control Board issued Capital Ready Mix an official Notice of Violation on September 30, 2021, requiring that the Facility provide the following by uploading the documents to SMARTS:

• A narrative description of how sediment tracking onto the street will be prevented. Update the SWPPP with any sediment tracking prevention procedures or newly deployed BMPs.

Capital Ready Mix has failed to comply with these mandates as of the date of this Notice.

### G. _Failure to Comply with Facility SWPPP_

The Facility's SWPPP indicates that the Facility will collect and analyze storm water samples from two qualified storm events within the first half of each reporting year (July 1 to December 31) and two QSEs within the second half of each reporting year (January 1 to June 30).

As detailed above, the Facility missed collecting storm water samples in the reporting years 2020-2021, 2021-2022 and 2022-2023.

The Facility's Site Map, attached to the Facility's current SWPPP, identifies 2 discharge locations from which storm water run-off samples are to be collected: SW-1 and SW-2.

As specified above, Capital Ready Mix failed to collect storm water samples from all outfalls as its Facility, in violation of its current SWPPP.

### H. _Failure to Properly Train Employees/Facility Pollution Prevention Team_

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Based on the foregoing violations, it is clear that Capital Ready Mix has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Capital Ready Mix may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

### IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Capital Ready Mix, as well as the respective corporate officers and employees of the Facility responsible for compliance with the CWA.

### V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is February 18, 2021, to the date of this Notice. EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice. Some of the violations are continuous in nature; therefore, each day constitutes a violation.

### VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

The attorney assigned to this matter is:

Adam D. Brumm, Esq.
Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215, extension 906
Email:  adam@edendefenders.org

**To ensure an expedited response to this Notice, please send all initial communications to the following email address:**  responses@edendefenders.org.


## VII.     RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT


CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of <u>$56,460.00 per day, for each violation occurring on or after November 2, 2015</u>.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to 33 U.S.C. § 1365(d), EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

## VIII.     CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages Capital Ready Mix's counsel to contact EDEN within 20 days of receipt of this Notice by sending an email to responses@edendefenders.org to initiate a discussion regarding the violations detailed herein and to determine how Capital Ready Mix may resolve this matter without the necessity of litigation.

60-Day Notice of Intent to Sue
Capital Ready Mix
December 29, 2023
Page 21 of 21

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if Capital Ready Mix wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If EDEN does not receive a response from Capital Ready Mix's counsel before the expiration of the 60-day notice period, this matter will be transferred to EDEN's litigation counsel. Thank you.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Michael Regan, Director, U.S. Environmental Protection Agency, regan.michael@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Eileen Sobeck, State Water Resources Control Board, eileen.sobeck@waterboards.ca.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov

# EXHIBIT B

  

State Water Resources Control Board

# NOTICE OF INTENT
GENERAL PERMIT TO DISCHARGE STORM WATER
ASSOCIATED WITH INDUSTRIAL ACTIVITY (WQ ORDER No. 2014-0057-DWQ)
(Excluding Construction Activities)

WDID:  5S34I029080                    Status:  Active

## Operator Information                Type:  Private Business

Name:  Capital Ready Mix          Contact Name:  Dan Reiff
Address:  11311 Pendleton         Title:
Address 2:                        Phone Number:  916-768-2345
City/State/Zip:  Sun Valley CA 91352   Email Address:  dreiff2018@gmail.com
Federal Tax ID:

## Facility Information                Level:

Contact Name:  Dan Reiff          Title:
Site Name:  Capital Ready Mix
Address:  5225 84th Street
City/State/Zip:  Sacramento CA 95826   Site Phone #:  916-768-2345
County:  Sacramento              Email Address:  dreiff2018@gmail.com
Latitude:  38.52835   Longitude:  -121.39585   Site Size:  3.2 Acres
Industrial Area Exposed to Storm Water:  3.2 Acres
Percent of Site Impervious (Including Rooftops):  50 %

## SIC Code Information

1.  3273                         Ready-Mixed Concrete
2.
3.

## Additional Information

Receiving Water:  Morrison Creek        Flow:  Indirectly
Storm Drain System:
Compliance Group:

RWQCB Jurisdiction:  Region 5S - Sacramento
Phone:  916-464-3291              Email:  r5s_stormwater@waterboards.ca.gov

## Certification

Name:  Tony Aneian              Date:  February 16, 2021
Title:  President CEO